UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SACV 16-01799-JVS(AGRx) | Date | October 3, 2023 |
| Title | SPEX Technologies, Inc. v. Western Digital Corporation, et al. | | |

Present: The Honorable **James V. Selna, U.S. District Court Judge**

| Elsa Vargas | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** **[IN CHAMBERS] Order Granting Defendant's Motion to Exclude Bergman (Dkt. 249)**

Before the Court is Defendants Western Digital Corporation, Western Digital Technologies, Inc., and HGST, Inc.'s (collectively, "Western Digital") Motion to Exclude Opinions and Testimony of Jim W. Bergman. Dkt. 249 ("Mot."). Bergman is the damages expert of Plaintiff SPEX Technologies, Inc. Western Digital argues that Bergman failed to apportion damages as to the remaining asserted claims, and he did not consider all comparable license agreements in assessing damages. SPEX filed an opposition. Dkt. 267 ("Opp."). Western Digital filed a reply. Dkt. 291 ("Reply"). The Court held a hearing on October 2, 2023. For the reasons stated below, the Court grants the Motion.

**I. B**ACKGROUND

In 2018, SPEX produced a damages expert report from Jim W. Bergrman. Dkt. 256-7 (sealed). In that report, Bergman "determine[d] damages adequate to compensate SPEX for infringement of U.S. Patent Number 6,003,135 ("the '135 [P]atent"), and U.S. Patent Number 6,088,802 ("the '802 [P]atent"). Id. ¶ 1. Bergman observed that, according to internal company documents, the '802 Patent "is primarily focused on embedded peripheral devices," and the '135 Patent "is primarily focused on replaceable modular devices." Id. ¶ 104.

At the time of Bergman's 2018 report, SPEX accused Western Digital of "directly infringing claims 55 and 57-58 of the '135 [P]atent," and "directly infringing claims 1-2, 11-12, and 38-39 of the '802 [P]atent." Id. ¶¶ 107, 111. In calculating damages based on

these asserted patents and claims, Bergman explained that, "[b]ased on my discussion with Dr. V. Thomas Rhyne, it is my understanding that the asserted claims of the patents-in-suit generally implicate the same features of the infringing technology. As a result, calculated damages are not dependent upon the claims found to infringe the Accused Products." Id. ¶ 10 n.4 (emphasis added).

In his 2018 report, Bergman conducted a Georgia-Pacific factors analysis to calculate the reasonable royalty that Western Digital would have paid as a result of the hypothetical negotiation. See id. ¶ 114. More specifically, Bergman broke down those factors into a market approach and an income approach. Id. ¶ 118. He explained that the income approach "determines the footprint of the invention based on the use made of the patents-in-suit by the Defendant," which "is frequently measured by calculating the incremental benefit to Defendant provided by the patents-in-suit." Id. ¶ 119; see also id. ¶ 121 (comparing accused products to non-infringing alternative). He also explained that the market approach "uses transactional data to determine the value of an asset," such as "us[ing] existing license agreements, comparable to the patents-in-suit, to assist in the determination of the reasonable royalty." Id. ¶ 149.

In conducting the market approach analysis for the '802 Patent, Bergman opined that "the value of the '135 [P]atent can also be determined using this same analysis" because, "[b]ased on [his] discussion with Dr. Rhyne [SPEX's technical expert], it is [Bergman's] understanding that the asserted claims of the patents-in-suit generally implicate the same features of the infringing technology." Id. ¶ 306 (emphasis added). "As a result," he opined that "the value attributable to the '135 is equivalent, but not additive to, the '802 [P]atent." Id.

Further, to support his Georgia-Pacific analysis, Bergman explained that he understands that "hardware encryption [claimed in the asserted patents] provides clear benefits over software encryption," and "SPEX's technical expert has also stated that greater usability, better security, faster performance and more secure authentication are all benefits of the patents-in-suit over a non-infringing software alternative and that, without the technology described in the patents-in-suit, Western Digital would have been unable to provide hardware encryption devices." Id. ¶¶ 324, 326.

Following IPR proceedings and MSJ proceedings before this Court followed by a partial reversal by the Federal Circuit, the asserted claims in the case changed. Specifically, when Bergman drafted his 2018 report, Claims 6, 7, and 25 of the '802 Patent were no longer in the case after the Court found them indefinite. The Federal Circuit subsequently reversed that ruling. Given the timing of the relevant rulings, Bergman's 2018 report did not include Claims 6, 7, and 25 because they were no longer asserted after they were found indefinite. After SPEX appealed this Court's MSJ rulings, the Federal Circuit reversed regarding indefiniteness, ruling that the '802 Patent "sufficiently links memory section 612a to the function recited in the 'means for providing' limitation." Dkt. 167, Slip. Op. at 11. Thus, Claims 6, 7, and 25 are back in the

case and are the only currently asserted claims.[1]

After remand, the Court allowed Bergman to provide a supplemental damages report addressing the currently asserted claims. See Dkt. 190 at 3 ("Both parties are granted leave to serve supplemental infringement and invalidity expert reports limited to the "means for producing" claim. Such reports can incorporate, if the parties so choose, opinions previously expressed by the expert as to duplicate claim elements subject to the duty not to alter them in violation of this order."). Thus, in June 2023, Bergman served a supplemental report.

In that report, Bergman explains that he was asked "to supplement my opinions concerning damages relating to certain claims of U.S. Patent No. 6,088,802 ("the '802 patent") alleged to be infringed by" Western Digital. Dkt. 250-14 ¶ 1. Bergman observes that "[t]he claims currently being asserted by SPEX against Western Digital are claims 6, 7, and 25 of the '802 [P]atent." Id. Bergman acknowledges that "at the time of [his] March 16, 2018 Expert Report," "the current Asserted Claims of the '802 patent were not at issue in this lawsuit;" his "opinion at the time therefore addressed the patent claims that were asserted at that time, which included claims 1-2, 11-12, and 38-39 of the '802 patent and claims 55 and 57-58 of U.S. Patent No. 6,003,135;" he "understand[s] that the claims addressed in the [2018] Bergman Report are no longer asserted by SPEX;" and he "understand[s] that each of the current Asserted Claims include the 'means for providing' limitation that was not present in the claims addressed in the [2018] Bergman Report." Id. ¶ 2.

To address the now-asserted claims, in his supplemental report, Bergman incorporates by reference his 2018 report and states, "[a]s discussed in the [2018] Bergman Report, '[b]ased on my discussion with Dr. V. Thomas Rhyne, it is my understanding that the asserted claims of the patents-in-suit generally implicate the same features of the infringing technology. As a result, calculated damages are not dependent upon the claims found to infringe….'" Id. ¶¶ 4, 6 (emphasis added). The rest of Bergman's report is built on this foundational assumption. See generally id.

Western Digital moves to exclude Bergman based on the contentions that (1) his supplemental report fails to "apportion damages based on the remaining claims at issue in this case," and (2) he "performs an inherently unreliable analysis" because SPEX's lawyers chose what licensing agreements Bergman should review. See generally Mot.

---

[1] The other originally asserted claims are no longer in the case due to the IPR proceedings and the Federal Circuit's decision affirming the balance of this Court's MSJ rulings. See Dkts. 109-5, 167; see also Western Digital Corp. v. SPEX Techs., Inc., IPR2018-00082, Paper 40 (PTAB Apr. 18, 2019); SPEX Techs., Inc. v. Western Digital Corp., 859 F. App'x 557 (Fed. Cir. 2021). Further, SPEX voluntarily dismissed the infringement claims concerning the '135 Patent. See Dkt. 83.

## II. LEGAL STANDARDS

Rule 702 allows expert testimony where "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). A party who plans to rely on expert testimony must disclose it and comply with the requirements of Rule 26(a)(2), including providing a written expert report.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93, 597 (1993), the Supreme Court explained that, in applying Rule 702, "the trial judge plays a 'gatekeeping role,' which 'entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1295 (Fed. Cir. 2015). "The Court emphasized that the focus 'must be solely on principles and methodology, not on the conclusions that they generate.'" Id. (quoting 509 U.S. at 595). "Under these rules, a district court may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case." Id. at 1295.

## III. DISCUSSION

A.   Damages Methodology

In its Motion, Western Digital moves to exclude Bergman because, despite that the asserted claims and therefore key limitation have changed, Bergman's supplemental report "conjures up the same damages amount as before for assumed infringement of these three different claims that have different technological benefits and different technological implementations." Mot. at 2. Western Digital contends that Bergman's decision to adopt his prior analysis wholesale without any new analysis must be excluded because it "is not 'based on sufficient facts or data' or the 'product of reliable principles and methods.'" Id. at 2-4 (quoting Fed. R. Evid. 702).

In particular, Western Digital asserts that Bergman's opinion creates an apportionment problem because the 2018 analysis, which has been re-adopted, did not consider the value added by the "means for providing" limitation in the currently asserted claims. Id. at 3-4 ("Mr. Bergman's Supplemental Expert Report is barebones and conclusory, and does not analyze the currently Asserted Claims."). Western Digital argues that Bergman's new opinion lacks foundation because it "purports to rely on Dr. Rhyne for [the] assumption that the technological benefits of the Asserted Claims are the same as the previously asserted claims' benefits," but in his supplemental report and deposition, Rhyne "espoused the opposite view." Id. at 4. Thus, Western Digital avers that "[t]here is no technological basis to say the exact same technological benefit flows from the 'means for providing' claims, which do not have the 'means for mediating'

4

limitation." Id. at 8.

SPEX responds that Western Digital fails to consider Bergman's "actual opinions." Opp. at 1. SPEX contends there is no issue with Bergman's supplemental opinions because "[c]urrently-asserted claims 6, 7 and 25 of the '802 patent are the same as the previously-asserted claims, except for the substitution of the 'means for providing…' limitation for the 'means for mediating' limitation," and Western Digital has conceded that the claims are "substantially similar." Id.; see also id. at 5-6. SPEX asserts that, where Bergman never engaged in a limitation-by-limitation analysis, but rather market and income approach analyses, Western Digital's challenge is misplaced. Id. at 2; see also id. at 6-9. SPEX argues that Western Digital's current challenges are similar to those already rejected by the Court in the related Apricorn case. Id. at 2. SPEX suggests that Western Digital's argument that Rhyne "disavowed" opinions relied on by Bergman, and its apportionment challenges, are issues for cross-examination. Id. at 2, 11-13.

The Court finds that Bergman's supplemental opinion, which adopts in-full his prior opinion based on different asserted claims, must be excluded because it lacks a factual foundation for its underlying technological assumption. There are two distinct issues.

*First*, there is a question of whether the claims presently before the Court create the same benefits as the claims evaluated in 2018. There is no inherent reason why this cannot be so, and such an assertion is obviously subject to cross-examination. Suppose the patent is one for preventing light from escaping from a source. Use of dark tape might be used, and serve as part of one claim. Use of a black epoxy substance might do the same thing, and serve as part of a separate claim. *Second*, there is a question of whether there is evidence in the form of technical expert opinion that the benefits are substantially the same. Bergman needs a technological basis to properly support his assumption that the "means for mediating" limitation in the previously asserted claims provides the same benefits in the accused products as the "means for providing" limitation in the currently asserted claims such that his prior analysis can be adopted without providing any new analysis, which is the foundation of his supplemental opinion.[2]

Bergman's 2018 Report makes clear that his conclusions were "[b]ased on [his] discussion with Dr. V. Thomas Rhyne," in which Bergman learned Rhyne's opinion that "the asserted claims of the patents-in-suit generally implicate the same features of the infringing technology," and "[a]s a result," Bergman's "calculated damages are not dependent upon the claims found to infringe the Accused Products." Dkt. 256-7 at ¶ 10 n.4. In turn, Bergman's 2023 Report states, "[a]s discussed in the [2018] Bergman Report, '[b]ased on my discussion with Dr. V. Thomas Rhyne, it is my understanding that

---

[2] The Court disagrees with Western Digital that this presents an apportionment issue and thus the Court declines to address Western Digital's apportionment arguments.

the <u>asserted</u> claims of the patents-in-suit generally implicate the same features of the infringing technology," so "[a]s a result, calculated damages are not dependent upon the claims found to infringe…."'" Dkt. 250-14 ¶¶ 4, 6 (emphasis added).

Notably, Bergman adds, "I have likewise discussed <u>the current Asserted Claims</u> with Dr. Rhyne and have reviewed his initial and supplemental expert reports. Based on my discussion with Dr. Rhyne, it is my understanding that the current Asserted Claims all implicate the same Accused Product features and functions as the claims addressed in the Bergman Report." <u>Id.</u> at 6 (emphasis added). But there is not factual support for the assertion.

A review of the record demonstrates that no factual, technological basis has been provided by Rhyne to support Bergman's conclusion that the current asserted claims and their "means for providing" limitation implicate the same accused product features and functions as the previously asserted claims and their "means for mediating" limitation. Bergman states that he arrived at this conclusion after speaking with Rhyne and reviewing Rhyne's 2018 and 2023 reports. Rhyne has provided no such technological opinion, however, that would provide the needed factual basis for Bergman, the damages expert, to use this assumption as a factual basis for his damages opinion.

*First*, Rhyne's 2018 Report did not consider "means for providing" because this limitation was not at issue in any then-asserted claim. <u>See</u> Dkt. 256-3. That report was limited to the then-asserted claims rather than all claims of the '802 Patent. <u>See, e.g.</u>, id. ¶¶ 1, 56, 195, 322, 772.

*Second*, Rhyne's 2023 Report also did not offer the opinion on which Bergman purports to rely. In that report, Rhyne notes that he previously explained that the claimed inventions "enable the creation of a device that ensures that data to be exchanged between the host computer and peripheral device [1] passes through the security functionality, and [2] that the security functionality is transparent in the host computer." Dkt. 256-2 at ¶16 (quoting Dkt. 256-3 ¶ 47).

Reflecting on the current asserted claims and the "means for providing" limitation, Rhyne explains that the ability to "enable[] the claimed 'peripheral device' to be able to provide its built-in, hardware encryption in a transparent manner without necessarily requiring special software or modified drivers . . . is reflected in the limitations of the Asserted Claims, including the 'means for providing' limitation." <u>Id.</u> ¶ 16. Thus, Rhyne appears to distinguish between the feature that [1] data passes through security functionality (relevant to the prior asserted claims) and [2] that security functionality is transparent to the host computer (relevant to the current asserted claims).

Although neither party's briefing addressed whether the accused functionality for "means for mediating" in the 2018 Report and the accused functionality for the "means for providing' in the 2023 Report are the same, a brief comparison suggests they are not.

6

For example, in 2018, Rhyne opined that the "means for mediating" limitation was met by the Ultrastar He10 accused device because "in its default setting [it] will encrypt all data with a default key and store that user data on the magnetic media as encrypted text." See, e.g., Dkt. 256-3 ¶¶ 99, 101, 236, 364, 487 (i.e., the data passes through the security functionality). Whereas in 2023, Rhyne opined that the "means for providing" limitation is met by the Ultrastar He10 because those "products include such a memory section 612a in the form of an SPI ("Serial Peripheral Interface") memory, which is the structure that corresponds to the required function of Element 6f [means for providing]." Dkt. 256-2 ¶¶ 40, 42. Although this comparison is a spot-check only, the Court trusts that if Rhyne identified the same accused functionality across any "means for mediating" claim in 2018 and any "means for providing" claim in 2023, SPEX would have highlighted that technological similarity for the Court.

*Third*, Rhyne did not offer this opinion during his 2023 deposition. Instead, he confirmed that he is not opining that the currently asserted "means for providing" claims " have a limitation directed to ensuring that the data to be exchanged between the host computer and the peripheral device passes through the security functionality," (i.e., the "means for mediating" requirement). Dkt. 250-11 at 97:22-93:2; see also id. at 93:3-12 (agreeing that "means for providing," not "means for mediating" is at issue now). Rhyne did not state that the same accused functionality implicates both limitations.

*Finally*, Bergman states that he developed his understanding from a conversation with Rhyne. Although Rhyne could not recall speaking with Bergman, see id. at 102:7-24, this is irrelevant to the present dispute because an undisclosed opinion that theoretically was disclosed in a private conversation with a damages expert would violate Rule 26 and be excluded under Rule 37(c)(1).

Because Bergman provides no technological factual foundation that would have allowed him to conclude that the distinct limitations "means for mediating" (previously asserted claims) and "means for providing" (currently asserted claims) implicate the same features of the accused technology, his supplemental opinions are not based on sufficient facts or data to allow them to be presented to the jury. See Fed. R. Evid. 702; Summit 6, 802 F.3d at 1295.

The issue presented here is distinct from that presented in the related Apricorn case where the Court denied a motion in limine to exclude Bergman because the same accused functionality was alleged to meet both now-invalidated and still-asserted claims. The Court denied Apricorn's challenge because SPEX "identified the same components in the accused products as satisfying the mediating step in [now invalidated] Claims 38 and 39 and the 'means for mediating' limitation in the [then-]asserted claims," so the damages could be the same where "the same allegedly 'infringing features' of the end product are implicated in the same way by each claim" and therefore would provide the same benefit from infringement. See SPEX Technologies v. Apricorn, Inc., Case No. 16-cv-7349, Dkt. 228 at 12 (C.D. Cal. Jan. 21, 2020). Unlike Apricorn, who did not argue that SPEX's

technical experts distinguished between the "mediating" step of the now-invalidated claims and the "means for mediating" step of the asserted claims such that the value may be different, Western Digital argues that Rhyne distinguishes between the previously asserted "means for mediating" limitation and currently asserted "means for providing" limitation. As stated, SPEX provides no analysis or comparison suggesting that Rhyne identified the same infringing features or functionality as meeting both the "means for mediating" (previously asserted claims) and "means for providing" (currently asserted claims) limitations such that Bergman could assume the same benefit to the accused products from infringing.

Because Bergman's opinions are not based on sufficient facts or data, they will be excluded. The Motion is granted on this basis.

     B.     2020 Settlement Agreement

Western Digital also argues that Bergman's opinion should be excluded as unreliable because he did not consider a 2020 settlement agreement between Spryus (Spex's predecessor) and Kingston, because counsel withheld the agreement from him. Mot. at 11. Western Digital contends that Bergman was required to at least review this agreement and opine on comparability to determine whether it influences his analysis. Id. at 11-12.

SPEX responds that the 2020 settlement agreement is properly not part of the case because it "was entered into after the original fact discovery period of this case closed and after Mr. Bergman served his 2018 Report." Opp. at 16. SPEX notes that the Court already "denied the production of that settlement in this case, finding it 'not relevant' to Mr. Bergman's damages opinions." Id. at 17 (citing Dkt. 234 at 6).

The Court agrees with SPEX that, consistent with its prior ruling, the 2020 settlement agreement is not relevant to this case, at least because it was created after the close of fact and expert discovery, and because it would exceed the scope of the narrowly updated expert reports permitted by the Court. See Dkt. 190. Accordingly, Bergman's failure to consider it does not provide a separate basis for exclusion.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Motion.

     **IT IS SO ORDERED.**

|  | : | 0 |
|---|---|---|
| Initials of Preparer | eva |  |